**Terri L. ROSANE, Plaintiff,**

v.

**SHANNON COUNTY SCHOOL DISTRICT 65–1, Defendant.**

No. Civ. 11–5020–JLV.

United States District Court, D. South Dakota, Western Division.

June 14, 2013.

Michael M. Hickey, Sarah Baron Houy, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, SD, for Plaintiff.

Naomi R. Cromwell, Richard Paul Tieszen, Jessica L. Filler, Wade Lee Fischer, Tieszen Law Office, Pierre, SD, for Defendant.

## ORDER

JEFFREY L. VIKEN, Chief Judge.

Pending before the court is defendant Shannon County School District 65–1's ("District") motion for summary judgment. (Docket 56). The court referred the motion to Magistrate Judge Veronica L. Duffy for resolution. (Docket 65). On March 5, 2013, Magistrate Judge Duffy filed a report recommending the court grant in part and deny in part defendant's motion for summary judgment. (Docket 69). Magistrate Judge Duffy recommended granting defendant summary judgment on plaintiff's hostile work environment claim, denying defendant summary judgment on plaintiff's retaliation claim, and denying defendant summary judgment on its claim of sovereign immunity. *Id.* Defendant timely filed objections. (Docket 70). Plaintiff filed a response to defendants' objections.[1] (Docket 71).

■ The court reviews *de novo* those portions of the report and recommendation which are the subject of objections. *Thompson v. Nix,* 897 F.2d 356, 357–58 (8th Cir.1990); 28 U.S.C. § 636(b)(1). The court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

For the reasons stated below, defendant's objections are overruled. The court adopts the report and recommendation of the magistrate judge in its entirety.

## A. DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

District asserts the magistrate judge erred in denying it summary judgment on

---

1. Fed.R.Civ.P. 72(b)(2) allows a party to respond to an opposing party's objections.

plaintiff's retaliation claim and in denying relief to District under the affirmative defense of statutory sovereign immunity. Neither plaintiff nor defendant object to the portion of the magistrate judge's recommendation granting defendant summary judgment on plaintiff's hostile work environment claim.

### 1. Retaliation Claim

Title VII declares "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because [an employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a).

■ "To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas*[2] burden-shifting framework." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir.2011) (citing *Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir.2011) (citation omitted)). Ms. Rosane does not assert direct evidence of retaliation. Under the *McDonnell Douglas* burden-shifting framework, the issue is whether Ms. Rosane has presented "an inference of retaliation." *Pye*, 641 F.3d at 1020.

■ In Title VII cases, the burden-shifting framework consists of three steps. *Id.* at 1021. First, the plaintiff must establish a *prima facie* case for her claim. *Id.* Second, the defendant has the opportunity to offer a non-retaliatory reason for its action. *Id.* Third, the plaintiff has the opportunity to prove the defendant's stated non-retaliatory reason was merely pretext. *Id.*

■ To establish a *prima facie* case of retaliation, the plaintiff must show (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the adverse employment action and the protected conduct. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1051 (8th Cir.2002).

In analyzing plaintiff's claim and viewing the facts, and inferences from those facts, in the light most favorable to the nonmoving party, the magistrate judge concluded (1) Ms. Rosane engaged in a protected activity "by filing her internal grievance and by filing her charge of discrimination with the SDDHR"; (2) Ms. Rosane suffered an adverse employment action whether she felt forced to resign or was terminated; and (3) a genuine issue of material fact existed as to the cause of Ms. Rosane's termination. (Docket 69 at pp. 1045–47). The magistrate judge recommended denying summary judgment because a genuine issue of material fact existed concerning the District's motives in terminating Ms. Rosane. *Id.* at pp. 1047–48.

District objects to the entirety of the magistrate judge's analysis relating to plaintiff's retaliation claim. Specifically, defendant argues the magistrate judge erred in finding that: (1) plaintiff exhausted her administrative remedies; (2) plaintiff engaged in a protected activity; (3) plaintiff suffered an adverse employment action; (4) a genuine issue of material fact existed regarding defendant's motives for terminating the plaintiff; and (5) a genuine issue of material fact existed regarding pretext. (Docket 70). District also objects to the magistrate judge's decision not to consider the final stage of the *McDonnell Douglas* analysis. *Id.* Each of these objections will be discussed separately.

---

**2.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### a. Whether plaintiff exhausted her administrative remedies related to her retaliation claim

Prior to filing a federal lawsuit, a Title VII claimant must exhaust administrative remedies. 42 U.S.C. § 2000e–5(b)–(c). The claimant must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or with the state's Division of Human Rights. *Id.* In this case, plaintiff filed a charge with the South Dakota Division of Human Rights ("SDDHR"). Once the claim is filed, SDDHR investigates the charge and issues a determination of probable cause. *Id.* A finding of no probable cause is considered a final agency action for purposes of appeal. SDCL § 20–13–28.1. If SDDHR makes a finding of no probable cause, the claimant can choose to appeal under the South Dakota Administrative Procedures Act or can appeal the SDDHR decision to the EEOC. 42 U.S.C. § 2000e–5(c)–(e), SDCL § 1–26–30. If the party chooses to file a complaint in federal court, the party must first obtain a right-to-sue letter from the EEOC. *Id.* at § 2000e–5(f)(1).

"The reason for requiring the pursuit of administrative remedies first is to provide the EEOC with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation." *Parisi v. Boeing Co.,* 400 F.3d 583, 585 (8th Cir.2005). "The proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court." *Id.* (citing *Shannon v. Ford Motor Co.,* 72 F.3d 678, 684 (8th Cir.1996)). Federal courts will "liberally construe an administrative charge for exhaustion of remedies purposes." *Id.* However, "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo,* a claim which simply was not made." *Id.* (citation omitted). "The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge." *Id.*

On October 14, 2009, plaintiff filed her charge of discrimination with the SDDHR, checking the boxes for discrimination based on race and retaliation. (Docket 56–24). Plaintiff's allegation of retaliation stemmed from the District's proposed involuntary transfer to Wolf Creek. *Id.* SDDHR issued a determination of no probable cause and dismissed the charge on February 11, 2010. (Docket 56–25). Plaintiff then appealed to the EEOC. On December 7, 2010, the EEOC adopted the findings of SDDHR and issued the plaintiff a notice of right-to-sue. (Docket 56–26). Plaintiff received the right-to-sue letter on December 10, 2010, and thereafter filed this lawsuit on March 9, 2011. (Docket 1).

█ In this case, District argues plaintiff failed to exhaust her administrative remedies related to her retaliation claim because her original charge contemplated the involuntary transfer rather than termination of employment. The plaintiff's administrative charge states, in part, "Terry Albers, from Human Resources required me to learn Lakota.... After I filed a grievance with the School Board stating I was being discriminated against because of my race, I was notified I would be transferred to the Wolf Creek School ... I believe the transfer to Wolf Creek is in retaliation for my discrimination complaint." (Docket 56–24). Plaintiff's federal complaint contends District retaliated against her "by telling her to learn the Lakota language, threatening to transfer her to another school, failing to investigate

the complaints of Plaintiff, and otherwise creating an intolerable working environment such that she was forced to resign." (Docket 1 at p. 5). The magistrate judge properly noted the issues as "whether Ms. Rosane's allegedly retaliatory termination is 'like or reasonably related' to the retaliation claim regarding the proposed involuntary transfer listed in her administrative charge." (Docket 69 at p. 1037).

The magistrate judge analyzed two decisions from the United States Court of Appeals for the Eighth Circuit discussing the requirement that federal claims be "like or reasonably related" to the claims brought in the administrative proceedings. (Docket 69 at pp. 1037–39) (citing *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 852 (8th Cir.2012) and *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir.2006)).

In *Richter*, a claimant filed an administrative charge alleging sex and race discrimination but did not check the box for retaliation. *Richter*, 686 F.3d at 849. After receiving her right-to-sue letter, the claimant brought a federal action alleging she was terminated in retaliation for filing the administrative charge. *Id.* The Eighth Circuit held that the termination constituted a separate actionable employment practice which was not "like or reasonably related" to the administrative charge. *Id.* The court noted the EEOC never had the opportunity to investigate or initiate a conciliation process on the retaliation claim. *Id.* at 853.

In *Wedow*, two female firefighters filed charges with the EEOC in 1997 alleging ongoing sex discrimination. 442 F.3d at 667. Each charge also alleged ongoing and continuing retaliatory denial of career-enhancing opportunities. *Id.* at 674. The lawsuit that followed the 1997 charges alleged discriminatory treatment and retaliation through 2000, including denial of ca-reer-enhancing opportunities, in violation of Title VII. *Id.* at 667–68. The plaintiffs were successful at trial. *Id.* at 667. The defendant appealed the jury verdict arguing it was entitled to judgment as a matter of law on the post–1997 retaliation claims that were not asserted in the 1997 EEOC charges because the plaintiffs did not administratively exhaust those claims. *Id.* at 672. The Eighth Circuit upheld the jury verdicts reasoning those claims were not precluded because they were like or related to the underlying EEOC charges that alleged ongoing and continuing retaliation. *Id.* at 672–75. The Eighth Circuit explained:

> [A] reasonable EEOC investigation of alleged 'ongoing and continu[ing]' retaliation in this case would certainly have focused on whether or not the retaliation alleged was in fact existent at the time of the filing of the charges and if it did indeed continue to exist at the time of the investigation. Unlike allegations of a discrete act of discrimination that occurred in the past and outside of the limitations period or that occurred subsequently but were unrelated to the scope of the EEOC charges, the allegations in the November 1997 EEOC charges filed in this case spoke of acts occurring in the present and specifically alleged future implications as well.

*Id.* at 674.

The magistrate judge found this case more closely resembled *Wedow* than *Richter* and concluded plaintiff's "termination, whether it consisted of resignation or dismissal, is of a 'like kind' to a proposed involuntary transfer ...." and therefore "[r]equiring Ms. Rosane to file another administrative change subsequent to her termination would create 'needless procedural barriers.'" (Docket 69 at p. 1038) (citing *Wedow*, 442 F.3d at 674). This court agrees. Plaintiff's administra-

tive claim alleged discrimination based on race and retaliation. Although the plaintiff's original retaliation claim had to do with the involuntary transfer, it would have been impossible for plaintiff to predict any future retaliation based on the filing of the complaint itself. *See Foster v. Roberts Dairy Co., LLC,* 372 F.Supp.2d 1165, 1173 (D.Neb.2005) (finding " 'A claim 'alleging retaliation by an employer against an employee for filing' a discrimination charge is one type of claim we have recognized as 'reasonably related' to the underlying discrimination charge.' ") (citations omitted). Based on a liberal reading, the court finds plaintiff's retaliation claim relating to her termination is "reasonably related" to her retaliation claim relating to the proposed involuntary transfer listed in her administrative charge. District's objection on this basis is overruled.

### b. Protected activity

■ The magistrate judge concluded Ms. Rosane engaged in protected activity "by filing her internal grievance and by filing her charge of discrimination with the SDDHR." (Docket 69 at p. 1045). The "filing of the internal discrimination complaint qualifies as protected conduct" as does the filing of the charge of discrimination with the SDDHR. *Pye,* 641 F.3d at 1020, 42 U.S.C. § 2000e–3.

District contends Ms. Rosane claimed the filing of the internal grievance was the protected activity, not the filing of her discrimination charge with the SDDHR. (Docket 70 at p. 6). "Ms. Rosane alleged that she was being discriminated against in the workplace in her grievance of September 18, 2009." (Docket 69 at p. 1045). Ms. Rosane did not specifically refer to race; however, she was alleging Ms. Conroy and Mr. Plenty Wounds were the ones discriminating against her. Ms. Rosane also alleged Ms. Conroy and Mr. Plenty

Wounds were using Lakota as a tool of exclusion.

District argues "because race was not indicated in Plaintiff's grievance, nor was it mentioned in the meetings with District prior to or subsequent to her grievance, any action taken in response to her grievance cannot be actionable under Title VII." (Docket 70 at pp. 7–8). Although race was not specifically mentioned, the record is clear that District understood Ms. Rosane's allegations as racial. In response to Ms. Rosane's grievance, District sent Ms. Rosane a letter which referenced District's policy prohibiting unlawful discrimination. (Docket 56–22). In addition, the letter also concluded the use of Lakota in Ms. Rosane's work environment was not being deployed in an attempt to harass, bully, or discriminate against Ms. Rosane. *Id.*

Ms. Rosane filed a charge of discrimination with SDDHR which explicitly referenced race discrimination. This constitutes a protected activity. 42 U.S.C. § 2000e–3. Based on this record, the court concludes Ms. Rosane engaged in a protected activity. District's objection on this basis is overruled.

### c. Adverse employment action

■ The magistrate judge concluded whether Ms. Rosane "felt forced to resign or .was terminated," she suffered an adverse employment action. (Docket 69 at p. 1045). In the Eighth Circuit, "[a]dverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Williams v. City of Kansas City,* 223 F.3d 749, 753 (8th Cir.2000). District argues Ms. Rosane's complaint alleged she was forced to resign, not that she was terminated. Since the filing of the complaint, the discovery showed Ms. Rosane was actually terminated by the District. Viewing the facts in the light most favorable to Ms. Rosane, the court concludes

Ms. Rosane suffered an adverse employment action regardless of whether she was forced to resign or District terminated her position. District's objection is overruled on this basis.

### d. Causal connection between the protected activity and the adverse employment action

■ District argues the time period between Ms. Rosane filing the internal grievance (September 18, 2009) and Ms. Rosane's termination (April 2010) precludes a finding her termination was causally related to filing her grievance. (Docket 57 at pp. 26). "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation. The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Tyler v. Univ. of Arkansas Bd. Of Trustees*, 628 F.3d 980, 986 (8th Cir.2011).

The magistrate judge noted the relevant dates for consideration when determining that a causal link existed between the protected conduct and the adverse employment action. (Docket 69 at p. 1046). First, Ms. Rosane filed her internal grievance on September 18, 2009. (Docket 56–17). Less than a week later, the subject of Ms. Rosane's involuntary transfer to another school was raised. (Docket 58 at ¶ 26). In addition to the proposed involuntary transfer, the SDDHR issued its finding of no probable cause on February 11, 2010. (Docket 56–25). Plaintiff appealed the decision of the SDDHR to the EEOC. The "School District fired Ms. Rosane just a matter of weeks after" she filed her appeal to the EEOC. (Docket 69 at p. 1046).

District asserts the magistrate judge erred in finding the relevant time line was determined by SDDHR issuing its finding of no probable cause in February 2010. (Docket 70 at p. 9). District misconstrues the magistrate judge's report. The decision issued by SDDHR was not the protected conduct, but rather the appeal to the EEOC.

District asserts the magistrate judge erred in considering whether there were any concerns about Ms. Rosane's performance prior to filing her grievance because "District has not asserted that Plaintiff's performance issues played a part in its decision related to Plaintiff's termination." (Docket 70 at p. 11). However, the magistrate judge correctly pointed out that "[i]n addition to temporal proximity between protected activity and adverse employment actions, a plaintiff can use alternate circumstantial evidence to prove causation-generally more than timing is required." (Docket 69 at p. 1046) (citing *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir.2004)). "A causal link between an employee's conduct and her termination may be shown if the retaliation occurred soon after the employee's protected conduct or if the employer's concerns about the employee's conduct arose only after the employee engaged in protected conduct." *Johnson v. Shinseki*, No. 4:08CV1872, 2011 WL 3703277 (E.D.Mo. 2011). The magistrate judge pointed out "Ms. Rosane was [not] the subject of any disciplinary action prior to filing her grievance." (Docket 69 at p. 1047). The court finds the magistrate judge did not err in considering whether Ms. Rosane had been subject to any disciplinary action prior to filing her grievance as this analysis is an alternate way of proving causation.

After considering the time line relevant to Ms. Rosane's action, the magistrate judge concluded there was an issue of material fact regarding the reason Ms. Rosane was terminated. Ms. Rosane con-

tends the reason for her termination was pretextual. Ms. Rosane alleges she called the School District on January 19, 2010, and March 25, 2010, to inquire about the status of the District's investigation of her complaint but received no response. (Docket 62 at p. 26). Ms. Rosane began working at Gordon Hospital on January 22, 2010. (Docket 56–4). District argues Ms. Rosane was terminated because District was "concerned about the implication that [Ms. Rosane] received benefits for over thee (3) months at a cost to the School District when [she was], in fact, able and willing to work and did work at other facilities." (Docket 56–29).

Based on this record, the magistrate judge determined:

[A] jury could arrive at two rationally possible conclusions regarding causation. A reasonable jury could conclude that Ms. Rosane contacted the School District on January 19, 2010, as one last effort to understand the status of her employment and the pending investigation and when she received no response, she sought to mitigate her damages by accepting employment at Gordon Hospital. A reasonable jury could alternatively conclude that Ms. Rosane knew she was still employed by the School District and that she misrepresented her health situation in order to receive benefits from the School District while working for Gordon Hospital.

(Docket 69 at p. 1047). Based on these possible conclusions, the magistrate judge determined a genuine issue of material fact existed regarding District's motives for terminating Ms. Rosane.

As noted by the magistrate judge, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 972

(8th Cir.2012) (internal citations omitted). It is for the jury to decide whether any inferences can be drawn from District's failure to respond to Ms. Rosane's attempts to contact District regarding her grievance. *See Minnis v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am.,* 531 F.2d 850, 854 (8th Cir.1975) ("Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment."). The court finds a genuine issue of material fact exists regarding District's motive for terminating Ms. Rosane. District's objection on this basis is overruled.

This same dispute also implicates the final stage of the pretext inquiry under the *McDonnell Douglas* burden-shifting analysis. Because the identical material fact issue exists in relation to the *prima facie* case, the court need not consider the final state of the burden-shifting analysis.

**2. Affirmative Defense of Sovereign Immunity**

District asserts the magistrate judge erred in concluding District was not protected by statutory sovereign immunity. (Docket 70 at p. 16). The Eighth Circuit held the "plain language" of Title VII "demonstrates Congress' intent to abrogate Eleventh Amendment immunity of the states in this area." *Okruhlik v. Univ. of Arkansas ex rel. May,* 255 F.3d 615, 623 (8th Cir.2001). Recognizing this limitation, District asserts it is entitled to state statutory sovereign immunity provided for under South Dakota law. (Docket 57 at p. 27). SDCL § 21–32A–3 states:

Except insofar as a public entity participates in a risk sharing pool or insurance is purchased pursuant to § 21–32A–1, any public entity is immune from liability for damages whether the function in which it is involved is governmental or

proprietary. The immunity recognized herein may be raised by way of affirmative defense.

District contends that because insurance coverage does not exist for this action, it has not waived sovereign immunity and is entitled to assert sovereign immunity as an affirmative defense. (Docket 57 at p. 29). District, in its motion for summary judgment, cites to several cases where the Eighth Circuit and district courts have applied state law to determine whether summary judgment is appropriate on the basis of sovereign immunity. *Id.* at p. 27. However, as noted by plaintiff, each of those cases deal with the application of state statutory sovereign immunity to state law claims brought in federal court. In this case, there is no state law claim. District is asking this court to apply state statutory sovereign immunity to a federal claim.

"Municipal defenses-including an assertion of sovereign immunity-to a federal right of action are, of course, controlled by federal law." *Owen v. City of Independence, Missouri,* 445 U.S. 622, 648 n. 30, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). The United States Supreme Court discussed the application of state laws that immunize government conduct otherwise subject to suit in relation to actions brought under § 1983. *Felder v. Casey,* 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). The Court noted that "[a]ny assessment of the applicability of a state law to federal civil rights litigation, therefore, must be made in light of the purpose and nature of the federal right." *Id.* The Court "held that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law

would thwart the congressional remedy...." *Id.*

Analogizing § 1983 and Title VII actions, the magistrate judge concluded that "[a]llowing South Dakota law to preempt Title VII provisions which subject state employers to employment discrimination lawsuits would thwart the underlying purpose of Title VII." (Docket 69 at p. 1048). Without explanation or citation to any authority, District asserts the principle established by the Supreme Court in § 1983 actions regarding sovereign immunity is not analogous to Title VII actions. This court disagrees. Under District's reasoning, no governmental agency in South Dakota would ever be subject to a Title VII action as long as it was without insurance coverage. This would thwart the purposes of Title VII in allowing persons to be made "whole for injuries suffered on account of unlawful employment discrimination." *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). District's objection is overruled.

## CONCLUSION

The court carefully considered the record in this case *de novo.* The court finds the report and recommendation to be an accurate and thorough recitation of the facts and applicable case law. The court further finds Judge Duffy's legal analysis to be well-reasoned and District's objections to be unpersuasive. Good cause appearing, it is hereby

ORDERED that defendant's objections to the report and recommendation (Docket 70) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 69) is adopted in full.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Docket 56) is granted as it relates to

plaintiff's hostile work environment claim and denied as it relates to plaintiff's retaliation claim and defendant's claim of sovereign immunity.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 56]

VERONICA L. DUFFY, United States Magistrate Judge.

### INTRODUCTION

Plaintiff Terri L. Rosane is a former employee of the Batesland School, which is located within Shannon County School District 65–1 ("the School District"). *See* Docket No. 1. She filed this lawsuit against her former employer alleging unlawful employment practices. *Id.* The School District moves for summary judgment on the grounds that Ms. Rosane did not exhaust administrative remedies, has not met the *prima facie* cases of her claims, and that the School District is immune from suit. *See* Docket No. 57. Plaintiff argues that genuine issues of material fact preclude the grant of summary judgment for the School District. *See* Docket No. 62.

Jurisdiction is proper in federal court based on the presence of a federal question under 28 U.S.C. § 1331. The Chief District Court Judge, the Honorable Jeffrey L. Viken, referred defendant's motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(A). *See* Docket No. 65.

### FACTS

#### A. Work Environment at the Batesland School

Terri Rosane worked at the Batesland School in South Dakota beginning in October 2007. Docket No. 1 at 2. Ms. Rosane is Caucasian. Docket No. 67 at ¶ 1. She held various positions in the kitchen, including breakfast cook, baker, and cook. Docket No. 64–2 at 12:1–8. When Ms. Rosane started and throughout her time at Batesland School, Bertha Conroy was head cook. *Id.* at 12:9–14; Docket No. 67 at ¶ 3. Pete Plenty Wounds later worked in the kitchen as well. Docket No. 64–2 at 12:15–23. Ms. Conroy and Mr. Plenty Wounds are Native American; their first language is Lakota and their second language is English. Docket No. 62 at 1; Docket No. 67 at ¶ 4.

Ms. Rosane was supervised by Connie Kaltenbach, the school principal (prior to Ms. Kaltenbach, Wayne Goff was the principal) and Carol Reitz, the food supervisor. Docket No. 56–4 at 21:12–23. Ms. Kaltenbach and Ms. Reitz are both Caucasian. Docket No. 56–7. Ms. Rosane considered Ms. Conroy to be her supervisor as well. According to Michael Brubaker, the Shannon County Classified Education Association representative, "Bertha believed ... herself to be the supervisor to anyone and everyone who walked into that kitchen." Docket No. 64–6 at 18:3–9.

Ms. Rosane kept a work-related journal beginning in October 2006 (the parties have agreed that Ms. Rosane's employment at Batesland School lasted from 2007 to 2010, but journal entries in 2006 reference Carol Reitz and Bertha Conroy). *See* Docket 56–9; Docket No. 67 at ¶ 1. The journal entries detail Ms. Rosane's perception of her interactions in the kitchen, particularly with Ms. Conroy and Mr. Plenty Wounds. *See generally* Docket No. 56–9. The last entry is for October 6, 2009. *Id.* at 14–15.

Beginning in the summer of 2008, Ms. Rosane alleges that she experienced severe hostility from Ms. Conroy and Mr. Plenty Wounds. Docket No. 62 at 2. According to Ms. Rosane, Mr. Plenty

Wounds and Ms. Conroy spoke Lakota in the kitchen and would not speak to her. *Id.* at 4. Due to their body language, she believed they were talking about her. *Id.* at 2. Ms. Rosane claims that Ms. Conroy stole her recipes and intentionally failed to tell her about a change in their start time (6:30 a.m. to 7:00 a.m.), changes in the menu, and a co-worker's birthday party. *Id.* at 3. Ms. Rosane alleges that at various times Ms. Conroy berated and ignored her. *Id.*

Ms. Rosane also reports that various statements made by Mr. Plenty Wounds and Ms. Conroy caused her distress. She claims that she overheard them refer to her as "the white woman." *Id.* at 4. Mr. Plenty Wounds allegedly told Ms. Rosane that there are "[N]atives in this school system that are prejudice[d] against white people." *Id.* at 3. Ms. Conroy allegedly commented that white teachers at the school were "here for the money, not for the kids." *Id.* When discussing the possibility of working at summer school at another school, Wolf Creek, Ms. Conroy allegedly told Ms. Rosane it was a bad idea, stating "they would run [Rosane] out," similar to how Ms. Conroy "could run [Rosane] out of Batesland if she didn't like [her]" because Ms. Rosane was the only white employee in the School District's kitchens. *Id.* at 4.

In summer 2009, at the beginning of the school year, Mr. Plenty Wounds and Ms. Conroy told the school principal, Connie Kaltenbach, that they had been called "F—ing Indians," allegedly by Ms. Rosane or her husband, Rob Rosane. *See* Docket No. 57 at 2; Docket No. 56–8 at 1. Ms. Rosane denied ever making such a comment, to which Ms. Conroy allegedly responded "Well, if you can go around saying 'F Indians,' I can go around saying 'F white people.'" Docket No. 56–9 at 3. Ms. Conroy also told Ms. Kaltenbach that Mr.

Rosane frequently glared at Ms. Conroy and Mr. Plenty Wounds and drove in circles around the school. Docket No. 56–8 at 1.

Later that summer, Ms. Rosane overheard Mr. Plenty Wounds and Ms. Conroy planning to report the "F—ing Indians" remark to a supervisor, the school board, and a police officer if necessary. *See* Docket No. 56–4 at 67:8–18; Docket No. 62 at 5. This caused Ms. Rosane to vomit and become very upset; she left school early that day. *See* Docket No. 56–4 at 67:19–68:1.

**B. Filing of Grievance and Administrative Complaint**

Terri and Rob Rosane sought advice from Michael Brubaker (the Classified Education Association representative). Docket No. 62 at 6. Mr. Brubaker contacted Terry Albers, the Human Resources director at the Batesland School, concerning Ms. Rosane's complaints about the kitchen working environment. Docket No. 57 at 2. On September 1, 2009, Mr. Albers held a fact-finding meeting to attempt to find a solution to the working environment in the kitchen. Docket No. 57 at 3. Ms. Kaltenbach, Mr. Albers, Ms. Reitz, Ms. Conroy, and Mr. Plenty Wounds were present at this meeting. *Id.* Ms. Reitz and Ms. Kaltenbach believed at the time that the meeting concerned Ms. Rosane's alleged negative treatment of Native Americans and recent problems with milk tray counts in the lunchroom. *Id.* Neither supervisor had received a complaint from Ms. Rosane at the time of this first fact-finding meeting. *Id.*

On September 3, 2009, Mr. Albers held another fact-finding meeting, this time with Ms. Reitz, Mr. Brubaker, Mr. Rosane, and Ms. Rosane. *Id.* Ms. Rosane requested that the only language spoken in the kitchen be English. *Id.* It was decided

that Mr. Albers would host a conflict resolution session with the three members of the kitchen staff: Ms. Rosane, Ms. Conroy, and Mr. Plenty Wounds. *Id.* at 4.

The conflict resolution meeting took place on September 8, 2009. Mr. Albers asked the kitchen staff what they would like changed in the kitchen. *Id.* Mr. Albers testified that Ms. Rosane did not mention discrimination at the conflict resolution meeting, nor did she share that she believed the others to be speaking about her in Lakota. *See* Docket No. 56–10 at 30:6–10. Mr. Albers proposed a monetary incentive for Mr. Plenty Wounds to teach Ms. Rosane Lakota words. *Id.* at 30:13–32:10. Ms. Conroy declined to participate in this plan. *Id.*

On September 9, 2009, Ms. Rosane went to work at Batesland School. *See* Docket No. 62 at 8. She alleges that she tried to learn some Lakota words from Mr. Plenty Wounds, that Ms. Conroy ignored her, and that Mr. Plenty Wounds and Ms. Conroy continued to speak Lakota. *Id.* Beginning on September 10, 2009, Ms. Rosane went on sick leave. *Id.* Ms. Rosane submitted slips from her nurse practitioner requesting that she remain on sick leave until October 22, 2009. *See* Docket Nos. 56–15; 56–16; 56–20.

Ms. Rosane filed a formal grievance with the school district on September 18, 2009. The grievance lists "date of occurrence" as September 9, 2009, and states: "Ms. Rosane has, on multiple occasions, stated that she is being discriminated against in the workplace of the Batesland School." Docket No. 56–17. Ms. Rosane requested that "[c]orrections shall be made in the cafeteria of Batesland School so that the grievant is no longer discriminated against nor mentally abused in the place of wor[k]." *Id.* The grievance does not use the word "race," but Ms. Rosane argues that she has always believed the alleged treatment toward her was due to race. *See* Docket No. 62 at 9.

On September 24, 2009, Superintendent Dan Elwood decided that an "involuntary transfer" pursuant to School District policy would benefit both Ms. Rosane and the School District. *See* Docket No. 56–21. Ms. Rosane signed a memorandum stating that a transfer to Wolf Creek School would be effective on October 5, 2009, but later declined the transfer. *Id.*

On September 28, 2009, Supt. Elwood wrote Ms. Rosane a letter detailing the School District's investigation of Ms. Rosane's initial oral complaint and later written grievance. *See* Docket 56–22. The agreement that Mr. Plenty Wounds would teach Ms. Rosane Lakota words was never implemented due to Ms. Rosane's sick leave. *Id.* at 2. That agreement was deemed null and void due to the filing of the written complaint. *Id.* Supt. Elwood detailed the methods of investigation and noted that Mr. Brubaker had the opportunity to interview witnesses and parties. *Id.* Supt. Elwood wrote:

> The investigation concluded that there is no law or regulation requiring that individuals employed at Shannon County School District speak only English in the workplace. Mr. Albers further concluded that the use of Lakota language in the workplace in this instance was not done for the purpose of harassing, bullying, or discriminating.

*Id.* Supt. Elwood noted that Ms. Rosane had not provided "concrete, particularized allegations," despite the request for more information. *Id.* at 3. The School District concluded that Ms. Rosane's allegations were unsubstantiated, but allowed her until October 6, 2009, to submit additional information. *Id.* If she declined to provide information or request an extension, Supt. Elwood informed her that he would issue

the investigative report and submit it to the board. *Id.*

Supt. Elwood wrote Ms. Rosane and Mr. Brubaker another letter on October 9, 2009. Docket No. 56–23. The School District granted Ms. Rosane's request for additional time to provide documentation, giving her until October 16, 2009. *Id.* The School District retained a third party to conduct the remainder of the investigation into Ms. Rosane's grievance. *Id.* Ms. Rosane claims that the School District's third party investigator did not allow her more time to decide whether she wanted to be interviewed with Mr. Brubaker present. *See* Docket No. 62 at 10, 21. Because Ms. Rosane declined the involuntary transfer, Mr. Elwood informed her that no further action would be taken on the involuntary transfer, but offered her a voluntary transfer at the termination of her medical leave status. Docket No. 56–22 at 2. Supt. Elwood explained that the School Board would not consider the grievance until the completion of the investigation and the final determination by the School District. *Id.*

On October 14, 2009, Ms. Rosane filed a Charge of Discrimination with the South Dakota Division of Human Rights ("SDDHR"). Docket No. 56–24. She checked the boxes for race and retaliation, alleging that the involuntary transfer to Wolf Creek was in retaliation for filing a grievance. *Id.* Mr. Brubaker discontinued his efforts on the School District grievance because the Rosanes told him they wanted to proceed with the SDDHR Charge and did not want to proceed with the School District grievance. *See* Docket No. 56–13 at 74:13–19; 122:11–18.

The School District granted Ms. Rosane's request for leave without pay until she notified the School District that she wanted to return to work or until the completion of the investigation. Docket No. 64–10. Ms. Rosane alleges that she did not receive any response from Supt. Elwood to her January 19, 2010, request to come back to work and for the School District to install audio and video recorders in the kitchen. Docket No. 62 at 11.

Ms. Rosane began working at the Gordon Hospital on January 22, 2010. Docket No. 56–4 at 112:12–15. Ms. Rosane alleges that she wrote to Supt. Elwood on March 25, 2010, requesting information on the status of her grievance. Docket 62 at 11. Supt. Elwood wrote Ms. Rosane a letter on April 1, 2010, stating that the School District would recommend that she be terminated at the next school board meeting. Docket No. 56–29. He expressed concern that Ms. Rosane had misrepresented her health situation and received benefits for over three months while she was able to work. *Id.*

On February 11, 2010, SDDHR issued a determination of no probable cause and dismissed Ms. Rosane's charge. Docket No. 56–25. When Ms. Rosane appealed the SDDHR determination, the EEOC adopted the findings of SDDHR and issued a notice of right to sue. Docket No. 56–26.

### C. School District's Statement of Undisputed Material Facts and Ms. Rosane's Responses

In support of its motion for summary judgment, defendant School District set forth a statement of 48 allegedly undisputed material facts. Docket 58. Ms. Rosane responded to this statement. Docket No. 63.

Ms. Rosane disputes any of School District's attempts to paraphrase and seeks to explain the context of the facts. *Id.* For example, School District set forth the following statement: "Plaintiff was absent from work on September 10, 2009 and

September 11, 2009." Docket No. 58 at ¶ 23. Ms. Rosane responded: "Admit that Plaintiff was absent from work for health reasons on the dates specified." Docket No. 63 at ¶ 23.

Ms. Rosane denies in part the statement that the school principal and the food service supervisor were her supervisors, adding that Ms. Conroy also supervised her kitchen duties. *Id.* at ¶ 5. In response to School District's statement that "Plaintiff was never disciplined for any issues relating to her job performance; she was not suspended from job duties; she was not demoted; she was not transferred; she did not receive a wage cut," Ms. Rosane adds that the School District initiated an involuntary transfer. *Id.* at ¶ 9. Plaintiff also disputes that the School District's stated reasons for initiating the involuntary transfer were genuine. *Id.* at ¶ 26.

In response to the statement that Ms. Conroy and Mr. Plenty Wounds spoke English during the day, Ms. Rosane asserts that on occasion Ms. Conroy and Mr. Plenty Wounds spoke Lakota the entire day. *Id.* at ¶ 13. Further, in response to School District's statement that "[p]laintiff told them it did not bother her" when Ms. Conroy and Mr. Plenty Wounds spoke Lakota, Ms. Rosane asserts that at first she did not mind, but she began to mind when Ms. Conroy made menu changes and the two talked about her in Lakota. *Id.* at ¶ 14. The School District states that Ms. Rosane was able to perform her job duties throughout the course of her employment. Docket No. 58 at ¶ 48. Ms. Rosane disputes this fact, stating that she "became physically ill, vomited at work, and had to take an extended sick leave and be put on anti-anxiety medications." *Id.* at ¶ 48. The School District filed a reply to Ms. Rosane's response, maintaining that there is no genuine issue of material fact in dispute. Docket No. 67.

## DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Helton v. Southland Racing Corp.*, 600 F.3d 954, 957 (8th Cir.2010). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the govern-

ing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.; see also* 10A Charles A. Wright, Arthur Miller, & Mary Ann Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1018 (8th Cir.2011) (citing *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir.2011)).

**B. Exhaustion of Administrative Remedies**

Ms. Rosane filed this lawsuit alleging violations of Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. *See* Docket No. 1; 42 U.S.C. §§ 2000e–3(a) and 2000e–5(f)(1), (3). Before filing suit in federal court, a Title VII claimant must exhaust administrative remedies. *See* 42 U.S.C. § 2000e–5(b)–(c). The claimant must file a charge of discrim-

ination either with the EEOC or with the state's Division of Human Rights. *See id.*

Here, Ms. Rosane elected to file a charge with the South Dakota Division of Human Rights ("SDDHR"). After the filing of an administrative charge, SDDHR acts in its investigatory capacity. At the end of the investigatory phase, SDDHR issues a determination of probable cause. If SDDHR determines that there is no probable cause, this constitutes final agency action. *See* SDCL § 20–13–28.1. At that point, the claimant has two choices. The claimant can appeal under the South Dakota Administrative Procedures Act, or the claimant can appeal the SDDHR decision to the EEOC. *See* 42 U.S.C. § 2000e–5(c)–(e); SDCL § 1–26–30. If the charging party chooses to file in federal court, she must complete the additional step of obtaining a right-to-sue letter from the EEOC before she may file a complaint in federal court. 42 U.S.C. § 2000e–5(f)(1).

The purpose of administrative exhaustion is to allow the EEOC the opportunity to investigate the possibility of a voluntary resolution without the need for the parties to litigate the dispute. *Parisi v. Boeing Co.,* 400 F.3d 583, 585 (8th Cir.2005). "The proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court." *Id.* (citing *Shannon v. Ford Motor Co.,* 72 F.3d 678, 684 (8th Cir.1996)). When construing whether allegations listed in the complaint are "like or reasonably related" to the administrative charge, federal courts will liberally construe the charge "for exhaustion of remedies purposes," but "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo,* a claim which simply was not made." *Id.* at 585. Federal courts review the determina-

tion of probable cause *de novo*. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 799, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

On October, 14, 2009, Ms. Rosane filed her Charge of Discrimination with the SDDHR, checking the boxes for discrimination based on race and retaliation. Docket No. 56–24. At the time, her allegation of retaliation stemmed from the School District's proposed involuntary transfer to Wolf Creek. *Id.* On February 11, 2010, SDDHR issued a determination of no probable cause and dismissed the charge. Docket No. 56–25. On appeal, the EEOC adopted the findings of SDDHR and issued a notice of right to sue. Docket No. 56–26. Ms. Rosane received this right-to-sue letter, dated December 7, 2010, on December 10, 2010. Docket No. 1. Ms. Rosane filed this lawsuit on March 9, 2011, within 90 days of her receipt of the right-to-sue letter. *See id.*

The School District does not dispute that Ms. Rosane exhausted her race discrimination (hostile work environment) claim. In support of its motion for summary judgment, the School District argues that Ms. Rosane has not exhausted her administrative remedies as to the retaliation claim because her original charge contemplated the involuntary transfer rather than termination of employment. *See* Docket No. 57 at 9. In the administrative charge, Ms. Rosane stated, in relevant part: "Terry Albers, from Human Resources, required me to learn Lakota.... After I filed a grievance with the School Board stating I was being discriminated against because of my race, I was notified I would be transferred to the Wolf Creek School ... I believe the transfer to Wolf Creek is in retaliation for my discrimination complaint." Docket No. 56–24. In her federal complaint, Ms. Rosane asserts that the School District retaliated against her, "by telling her to learn the Lakota

language, threatening to transfer her to another school, failing to investigate the complaints of Plaintiff, and otherwise creating an intolerable working environment such that she was forced to resign." Docket No. 1 at 5. Accordingly, the issue is whether Ms. Rosane's allegedly retaliatory termination is "like or reasonably related" to the retaliation claim regarding the proposed involuntary transfer listed in her administrative charge.

Following the Supreme Court's decision in *National Railroad Passenger Corporation v. Morgan*, the Eighth Circuit has "considerably narrowed" its view of "like or reasonably related to" analysis, but has not "wholly abandoned the theory that reasonably related subsequent acts may be considered exhausted." *Compare Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 852 (8th Cir.2012); and *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir.2006); *see generally Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

In *Wedow v. City of Kansas City, Missouri*, female firefighters specifically asserted violations of Title VII anti-retaliation provisions and described denials of assignments and opportunities for promotion when filing their administrative charge in November 1997. *Wedow*, 442 F.3d at 674. In their complaint, the firefighters then alleged that this retaliation continued from 1998 to 2000, subsequent to filing the administrative charge. *Id.* The Eighth Circuit characterized this conduct as "ongoing retaliation," noting that forcing the firefighters to file new administrative charges "would create needless procedural barriers." *Id.* (citing *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir.1986)). "[W]here the subsequent retaliatory acts were of a like kind to the retaliatory acts alleged in the EEOC charge," the claims

were not barred for failure to exhaust administrative remedies. *Id.*

In *Richter v. Advance Auto Parts, Inc.*, a store manager reported fellow employees' misconduct to her supervisor. *Richter*, 686 F.3d at 849. A few days later, the supervisor told her she had one week to reapply for a position with lower pay and different responsibilities because she had failed to make bank deposits correctly. *Id.* She filed an administrative charge alleging sex and race discrimination but did not check the box for retaliation. *Id.* Pursuant to an EEOC "right-to-sue" letter, she filed suit in federal court, alleging that she was terminated in retaliation for filing the administrative charge. *Id.* Reasoning that the termination constituted a separate actionable employment practice in this case, the Eighth Circuit held that she had not exhausted her administrative remedies on the retaliation claim. *Id.* at 851. The court noted that the EEOC never had the opportunity to investigate or initiate a conciliation process on the retaliation claim. *Id.* at 853; *see also Parisi*, 400 F.3d at 584–86 (subsequent failures to rehire were "separate and completed act[s]" rather than a continuing violation reasonably related to the original administrative charge where employee listed one incident of failure to rehire but stated in second amended complaint that he was "repeatedly denied employment").

For the reasons set forth below, the exhaustion of remedies in the instant case more closely resembles *Wedow* than *Richter*. Like the female firefighters in *Wedow*, Ms. Rosane originally asserted retaliation in her administrative charge. Ms. Rosane's termination, whether it consisted of resignation or dismissal, is of a "like kind" to a proposed involuntary transfer. Ms. Rosane did not specify that the retaliation was ongoing. But as Ms. Rosane notes in her response brief, "it would be impossible for a plaintiff to allege retaliation in the administrative complaint, if the retaliation stemmed from the protected activity of filing the complaint itself." Docket No. 62 at 14 (citing *Foster v. Roberts Dairy Co.*, 372 F.Supp.2d 1165, 1173 (D.Neb.2005)). Requiring Ms. Rosane to file another administrative charge subsequent to her termination would create "needless procedural barriers." *Wedow*, 442 F.3d at 674. Her retaliation claim relating to her termination is "reasonably related to" her retaliation claim relating to the proposed involuntary transfer. Ms. Rosane has exhausted her administrative remedies. Accordingly, this court will reach the merits of all of her Title VII claims.

**C. Hostile Work Environment** [1]

Under Title VII of the Civil Rights Act of 1964, an employer may not

---

1. In support of its motion for summary judgment, School District discusses three claims: race discrimination, hostile work environment, and retaliation. *See* Docket No. 57 at 30. Although plaintiff's complaint lists Count 1 as "discrimination on the basis of race," the enumerated paragraphs assert a claim for hostile work environment. *See* Docket No. 1 at 2–3. Hostile work environment is not specifically pled. *See id.* While the *prima facie* cases for race discrimination and hostile work environment overlap somewhat, they involve separate analyses.

Ms. Rosane's response to defendant's motion for summary judgment only asserts a hostile work environment claim. *See* Docket No. 62. Therefore while plaintiff has not specifically denied the existence of a separate race discrimination claim, this court can infer that "Count 1" refers only to a hostile work environment claim. *See* Docket No. 1 at 2; Docket No. 62 at 14–27. Count 2, retaliation, is discussed below within the context of burden-shifting framework. *See generally Pye*, 641 F.3d at 1018–20 (*McDonnell Douglas* employment discrimination burden-shifting

discriminate against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). The creation of a hostile work environment is one way in which an employer can practice discrimination. The Supreme Court has defined "hostile work environment" as a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,'" such that it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

To prevail on her hostile work environment claim, Ms. Rosane must prove unwelcome harassment on account of her race, which was sufficiently severe or pervasive to affect a term, condition, or privilege of her employment. *See Bowen v. Missouri Dep't of Social Servs.*, 311 F.3d 878, 883 (8th Cir.2002); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir.2002). The parties do not dispute that Ms. Rosane is a member of a protected class. *See* Docket No. 57 at 15.

### 1. Unwelcome Harassment Based on Race

■ In her complaint, Ms. Rosane alleges that Bertha Conroy and Pete Plenty Wounds and other employees and agents of School District instigated the following discriminatory conduct against her: "remarks about Plaintiff's race, refusal to interact with her, and threats that she would be run off the reservation. Plaintiff was subject to such conduct because of and on the basis of her race, which was white." Docket No. 1 at 3. Ms. Rosane believed

her coworkers were speaking about her when they spoke Lakota. Docket No. 62 at 2–4. Ms. Rosane alleges that at various times Ms. Conroy berated and ignored her, stole her recipes, refused to talk to her or acknowledge her, and failed to tell her about a change in start time. *Id.* at 3. Ms. Rosane claims that she overheard them refer to her as "the white woman." *Id.*

Finally, Ms. Rosane claims the following statements amount to race-based harassment: Mr. Plenty Wounds stated there are "Natives in this school system that are prejudice[d] against white people"; Ms. Conroy stated that she "could run [Rosane] out of Batesland if she didn't like [her] ... because she was the only white person in the Shannon County School kitchens"; and Ms. Conroy stated: "Well, if you can go around saying F Indians, I can go around saying F white people." *Id.* at 3–4; Docket No. 56–9 at 3.

It is evident that Ms. Rosane did not always get along smoothly with Ms. Conroy and Mr. Plenty Wounds. It does not necessarily follow that Ms. Rosane was subjected to a hostile work environment. Refusing to interact with one's coworker or supervisee is not discriminatory on its face. *See e.g., Williams*, 223 F.3d at 754 (where female employee asked male supervisor to stop bothering her and he stopped talking to her for two weeks, court noted: "[v]iewed in the light most favorable to [employee], [supervisor's] silent treatment is at most ostracism, which does not rise to the level of an actionable adverse employment action"). Similarly, referring to someone as a "white woman," is facially neutral as the adjective can be used for identification purposes rather than derogatory ones. Although Ms. Rosane continues to assert that she understood that her

framework used for retaliation claims but not        for hostile work environment claims).

coworkers were talking about her when they spoke Lakota, she stated in her deposition that she didn't understand Lakota. *Compare* Docket No. 63 at ¶ 39 *and* Docket No. 56–4 at 75:3–8. Ms. Rosane argues that a teacher who overheard Ms. Conroy speaking Lakota stated "She's just being mean." Docket No. 56–4 at 75:10–23.

"Not all unpleasant and uncivil conduct creates a hostile work environment." *Bowen,* 311 F.3d at 884; *see also Woodland,* 302 F.3d at 843; *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1051 (8th Cir.2002). But where "epithets carr[y] clear racial overtones, they permit an inference that racial animus motivated not only [ ] overtly discriminatory conduct but all [ ] offensive conduct." *Bowen,* 311 F.3d at 884. The statements allegedly made by Mr. Plenty Wounds and Ms. Conroy do give rise to an inference of racial animus. A reasonable jury could therefore conclude that Ms. Rosane was subject to unwelcome harassment on the basis of her race. This court must next determine whether that harassment was so "severe or pervasive" that it subjectively and objectively affected Ms. Rosane's employment.

### 2. Whether Harassment Was So "Severe or Pervasive" that it Affected a Term, Condition, or Privilege of Employment

In her complaint, Ms. Rosane claims "[t]hat the conduct of Conroy and Plenty Wounds, who are both Native Americans, created an intimidating, hostile, and offensive work environment and unreasonably interfered with Plaintiff's ability to perform the duties of her position." Docket No. 1 at 3. Courts look at the circumstances surrounding the unwelcome harassment to determine whether it affected a term, condition, or privilege of employment and will consider the following factors:

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris* 510 U.S. at 23, 114 S.Ct. 367; *Bowen,* 311 F.3d at 884.

In *Ross v. Douglas County, Nebraska,* the Eighth Circuit affirmed the District Court's entry of judgment on a jury verdict for the plaintiff on his hostile work environment claim. *Ross v. Douglas Cnty., Neb.,* 234 F.3d 391, 393 (8th Cir. 2000). Ross' supervisor frequently referred to him using racial slurs, such as "n——r" and "black boy." *Id.* The Eighth Circuit noted that testimony at trial established that "[his supervisor] constantly referred to Ross by a racial epithet." *Id.* at 397.

In *Bowen v. Missouri Department of Social Services,* the Eighth Circuit reversed the lower court's grant of summary judgment for the employer on an employee's hostile work environment claim. *Bowen,* 311 F.3d at 880. The Eighth Circuit concluded that Bowen had produced sufficient evidence to preclude summary judgment, noting the progressively hostile nature of her supervisor's conduct. *Id.* at 885. The conduct which pervaded Bowen's work environment included the comment that she was a "white b——h," frequent hostile stares by her supervisor, her supervisor's violent act of destroying a cake she had made for her co-workers, the comment

that she was a "menopausal white b——h," the threat of a physical beating, and an incident where her supervisor ran directly at her. *Id.* Bowen's co-workers also warned her that her supervisor "did not like white people" and had threatened to shoot fellow employees. *Id.*

■ Ms. Rosane must demonstrate that the unwelcome harassment was severe or pervasive so as to affect a term, condition, or privilege of her employment under both an objective and subjective standard. *Willis v. Henderson,* 262 F.3d 801, 808 (2001). In *Willis v. Henderson,* an African American post office employee filed a complaint after his coworkers called him a monkey and a communist, bragged about their affiliation with militia groups and the KKK, and continued to make derogatory remarks about him after he complained. *Id.* at 803–05. The employee also found a racist cartoon at his workstation, which prompted him to take a leave of absence. *Id.* at 805. He consulted a psychologist, who diagnosed him with depression and anxiety. *Id.* at 806.

In *Willis,* the Eighth Circuit affirmed the district court's determination that these circumstances, although subjectively distressing to the plaintiff, were not sufficiently severe or pervasive as to alter the terms, conditions, or privileges of employment when viewed under an objective standard. The court noted that the employee "never meaningfully returned to work after the [cartoon] incident." *Id.* at 809. As for the "unpleasant conduct and rude comments" directed at Willis by his coworkers, the Eighth Circuit noted that "Title VII is 'not designed to create a federal remedy for all offensive language and conduct in the workplace' nor can we, under the auspices of Title VII, 'impose a code of workplace civility.'" *Id.* at 809–10 (citing *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir.1999)).

### a. Subjective Standard

■ Viewed subjectively, the unwelcome harassment Ms. Rosane experienced did affect a term, condition, or privilege of her employment. Ms. Rosane was meeting her employer's expectations. Docket No. 57 at 11. She believed, however, that Ms. Conroy and Mr. Plenty Wounds' unwelcome harassment was so severe that she could not return to work. When she overheard them planning to report a derogatory remark allegedly made by Mr. or Ms. Rosane to a supervisor, she vomited, became upset, and left work early. Docket No. 56–4 at 67:19–68:1. Ms. Rosane requested to remain on sick leave due to anxiety and submitted slips from her nurse practitioner. *See* Docket Nos. 56–15; 56–16; 56–20. The School District later granted Ms. Rosane's request for leave without pay until she wanted to return to work or the investigation was completed. *See* Docket No. 64–10. The court finds that Ms. Rosane has established that her work environment was subjectively severe or pervasive enough to her that it affected a term or condition of her employment.

### b. Objective Standard

■ However, establishing that the standard was subjectively met is not enough. Ms. Rosane must also show that the conduct was objectively severe or pervasive. That is, conditions were such that a reasonable person in Ms. Rosane's place would have found the conditions so severe or pervasive that a term or condition of her employment was affected.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Woodland,* 302 F.3d at 843. It is evident that Ms. Rosane's case is distinguishable from Ross and *Bowen* based on

the frequency and severity of the alleged statements. "[I]solated incidents (unless extremely serious) will not amount to discriminatory charges in the 'terms and conditions of employment.'" *Ross v. Kansas City*, 293 F.3d at 1051 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Additionally, in contrast to the unwelcome harassment in *Bowen*, Ms. Conroy and Mr. Plenty Wounds did not threaten Ms. Rosane with physical harm. Like in *Willis*, Ms. Rosane can meet the subjective but not objective standard.

Looking at factors such as the frequency, severity, threatening nature of the conduct, and inference with work performance, Ms. Rosane's work environment was not objectively hostile or abusive enough so as to have affected a term, condition, or privilege of her employment. A journal she kept in which she documented incidents at work that bothered her show that from the time she began employment (either 2006 or 2007), until the spring of 2009, there were only three incidents documented, and none had to do with racial overtones. *See* Docket No. 56–9, page 1. From April 16, 2009, until July 13, 2009, there were only two incidents documented by Ms. Rosane which had racial overtones. *Id.* at 1–2.

July 14, 2009, was the day that the "F— g Indians" discussion was had. *Id.* at 2. The atmosphere between Ms. Rosane and Ms. Conroy and Mr. Plenty Wounds clearly became more unpleasant and strained after this discussion. Even after this, however, the incidents documented by Ms. Rosane were not daily. She documented that Ms. Conroy and Mr. Plenty Wounds spoke Lakota around her on 11 separate days between July 16, 2009, and September 8, 2009. *Id.* Numerous instances are documented where Ms. Conroy gave Ms. Rosane "the silent treatment." The court

does not take Ms. Rosane's journal to be determinative of the facts of Ms. Rosane's hostile work environment claim as the School District argues should be done. However, the journal is illustrative of the types, timing, and severity of the instances of harassment alleged by Ms. Rosane.

As the Eighth Circuit held in *Willis*, race-based harassment must be so severe or pervasive as to affect a term, condition, or privilege of employment judged under *both* an objective and subjective standard. *Willis*, 262 F.3d at 808 (emphasis supplied). Here, the conduct was not severe. Furthermore, it was not pervasive enough to have been objectively hostile or abusive, though the court does not question Ms. Rosane's subjective assertion that she found it so. Because Ms. Rosane's work environment was not objectively hostile or abusive, she has not met the *prima facie* case of hostile work environment. Accordingly, the court recommends granting defendant's motion for summary judgment on the hostile work environment claim.

3. **When Harassment is by a Co-worker, Whether Employer Knew or Should Have Known**

█ If a co-worker, rather than a supervisor, is the instigator of unwelcome race-based harassment, a plaintiff bringing a hostile work environment claim must prove that his or her employer knew or should have known of the harassment and failed to take adequate remedial measures. *See Bowen*, 311 F.3d at 883; *Woodland*, 302 F.3d at 843. In Ms. Rosane's complaint, she describes Bertha Conroy and Pete Plenty Wounds as "supervisor/co-workers." *See* Docket No. 1 at 2. If Ms. Conroy and Mr. Plenty Wounds were supervisors, Ms. Rosane does not need to prove the knew-or-should-have-known element of the *prima facie* case. If they were co-workers, she must prove the

School District knew or should have known about the harassment she experienced and failed to take adequate remedial measures.

Because the court has found that Ms. Rosane has not proved that the harassment was severe or pervasive enough to constitute a hostile work environment, it need not determine whether Ms. Conroy or Mr. Plenty Wounds were supervisors. However, in the event the district court disagrees with that conclusion, the court also provides the following analysis of the supervisor issue.

▇ The Eighth Circuit and a majority of federal courts of appeals have defined supervisor as one who "had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir.2004) (adopting the majority definition and noting that the "decisions of the few circuits to address the question ['who is a supervisor'] are not entirely consistent"). Ms. Rosane urges this court to consider *Vance v. Ball* State University, pending before the Supreme Court this term. *See* Docket No. 62 at 16 (citing Brief for Petitioner, *Vance v. Ball State Univ.*, —— U.S. ——, 133 S.Ct. 23 (2012) (No. 11–556), 2012 WL 3803439). The plaintiff in Vance challenges the majority definition of "supervisor," urging the Supreme Court to adopt a less rigorous definition ("those whom the employer vests with authority to direct and oversee [ ] daily work"). 2012 WL 3803439 at *14–*18 (see also "Question Presented").

Existing Eighth Circuit case law defines a supervisor as one who can take "tangible employment action." *Joens*, 354 F.3d at 940. For example, a "team leader" who can "assign employees to particular tasks" is not a supervisor. *Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir.2007)

(citing *Weyers v. Lear Oper. Corp.*, 359 F.3d 1049, 1057 (8th Cir.2004)). Similarly, the Eighth Circuit held that a construction foreman who may have consulted with a supervisor regarding tangible employment actions but lacked the authority to make such decisions himself was not a supervisor. *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 851 (8th Cir.2005). Under the Eighth Circuit definition, neither Ms. Conroy nor Mr. Plenty Wounds were supervisors because they could not take "tangible employment action" against Ms. Rosane. *Joens*, 354 F.3d at 940.

However, the plaintiff in *Vance* is asking the Supreme Court to expand the definition of "supervisor" to include those persons who oversee the day-today work of the plaintiff, though they may not have the power to hire or fire. Under this alternative definition (which the Supreme Court may or may not adopt), Ms. Rosane argues that Ms. Conroy, the head cook, was her supervisor because she had the ability to direct Ms. Rosane's duties as well as provide input for performance evaluations. *See* Docket No. 62 at 16–17.

In her deposition, Ms. Rosane confirms that her supervisors were Connie Kaltenbach (the school principal) and Carol Reitz. *See* Docket No. 56–4 at 96:4–7. According to Michael Brubaker, the Shannon County Classified Education Association representative, "Bertha [Conroy] believed ... herself to be the supervisor to anyone and everyone who walked into that kitchen." *See* Docket No. 64–6 at 18:3–9. Ms. Rosane argues that this disputed issue is one of fact for the jury.

The court notes that this court is bound by existing Eighth Circuit precedent. Under that precedent, Ms. Conroy and Mr. Plenty Wounds are not supervisors. The court cannot analyze an alternative standard that the Supreme Court may or may

not adopt for the simple reason that that standard is as of yet unknown. The best this court can do at present is no more and no less than its duty: to determine what existing binding precedent is and apply it to the facts of the case before it. This, the court has done.

### 4. Affirmative Defense

■ When an employee is the subject of a hostile work environment caused by her supervisor, the employer is vicariously liable for the harassment. *See Faragher v. Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). There is, however, an affirmative defense to this otherwise automatic liability: if no adverse employment action occurred, an employer may avoid liability by showing that the employer exercised reasonable care to prevent and promptly correct any harassing behavior and the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 764–65, 118 S.Ct. 2257. The parties discuss whether the affirmative defense to hostile work environment described in *Ellerth* and *Faragher* applies in this case.

■ The court need not engage in that analysis. The affirmative defense only applies in cases where the harassment is conducted by a supervisor and no adverse employment action has occurred. *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 764–65, 118 S.Ct. 2257. Here, the court has concluded that the harassment was conducted by co-workers, not supervisors, and there clearly was an adverse employment action taken. (Ms. Rosane was fired and, although the motivation for her termination is disputed, the

fact of her termination is not). Thus, the affirmative defense cannot apply in this case because the harassment was perpetrated by co-workers and because the School District implemented an adverse employment action. Should this court be wrong about whether Ms. Rosane has made out a *prima facie* case of harassment, and also wrong about Ms. Conroy's status as a co-worker, and also wrong about whether an adverse employment action occurred, the affirmative defense would come into play and would have to be analyzed.

## D. Plaintiff's Retaliation Claim

### 1. *McDonnell Douglas* Burden–Shifting Framework

To defeat summary judgment on a retaliation claim, a plaintiff must present direct evidence of unlawful retaliation or create such an inference under *McDonnell Douglas* burden-shifting framework. *Pye*, 641 F.3d at 1020 (citing *Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir.2011)). Direct evidence "demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable trier of fact that the harmful adverse action was in retaliation for the protected conduct." *Id.* Ms. Rosane does not assert direct evidence of retaliation. *See* Docket No. 62. Accordingly, the issue becomes whether plaintiff has presented "an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Pye*, 641 F.3d at 1020.

The burden-shifting framework in Title VII cases, derived from *McDonnell Douglas Corp. v. Green*, consists of three steps. *Id.* at 1021; *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir.2012); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must

establish a *prima facie* case of her claim. *Pye,* 641 F.3d at 1021. Next, defendant has the opportunity to offer a non-retaliatory reason for its action. *Id.* Finally, the plaintiff has the opportunity to prove that defendant's stated non-retaliatory reason was merely pretext. *Id.*

### 2. *Prima Facie* Case of Retaliation

Title VII prohibits retaliation by an employer against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* at 1020 (citing 42 U.S.C. § 2000e–3(a)). To establish a *prima facie* case of retaliation, the employee must establish that (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) a causal link exists between the adverse action and the protected conduct. *Id.* at 1021.

#### a. Protected Activity

Ms. Rosane satisfied the first element by filing her internal grievance and by filing her charge of discrimination with the SDDHR, which are both protected activities under Title VII. *Id.* at 1020. The School District argues that Ms. Rosane did not engage in protected activity prior to filing her charge of discrimination in October, 2009, with the SDDHR. This argument is disingenuous.

Ms. Rosane alleged that she was being discriminated against in the workplace in her grievance of September 18, 2009. While she did not specifically reference race, she was alleging that Ms. Conroy, a female, and Mr. Plenty Wounds, a male, were the ones discriminating against her. That fact, coupled with her allegations about the use of Lakota as a tool of exclu-

sion, could lead one to infer that race was the basis of Ms. Rosane's allegations.

Indeed, the School District appears to have accurately understood that Ms. Rosane was alleging a hostile work environment claim. In a written response to her grievance dated September 28, 2009, the School District wrote that it concluded that the use of Lakota in Ms. Rosane's work environment was not being deployed in an attempt to harass, bully, or discriminate against Ms. Rosane. The later SDDHR charge-filed approximately one month later-was explicit in its reliance on race as the basis of Ms. Rosane's discrimination allegation. The court concludes that Ms. Rosane has adduced enough evidence to show that she engaged in protected activity sufficient to survive summary judgment on this element.

#### b. Materially Adverse Employment Action

In the retaliation context, the Eighth Circuit has noted: "[a]dverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Williams v. City of Kansas City,* 223 F.3d 749, 753 (8th Cir.2000). Viewing the facts, and inferences from those facts, in the light most favorable to the nonmoving party on this summary judgment motion, Ms. Rosane's termination from School District, whether she felt forced to resign or was terminated, constitutes an adverse employment action.

This court expresses no opinion as to whether the proposed transfer constituted an adverse employment action as the transfer did not occur. In response to defendant's statement "Plaintiff was not transferred to Wolf Creek School," Ms. Rosane responded: "Admit that the transfer initiated by the District did not come to fruition." Docket No. 67 ¶ 11. Ms. Rosane knew this when she filed her charge

with the SDDHR. *See* Docket No. 56–23 at 2 (charged was filed October 14 and she had declined the transfer on October 6). "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." *Turner v. Gonzales,* 421 F.3d 688, 697 (8th Cir.2005) (citing *Fisher v. Pharmacia & Upjohn,* 225 F.3d 915, 919 (8th Cir.2000)). The proposed transfer would have increased Ms. Rosane's commute, but it is not clear that the transfer would have significantly changed her working conditions. Even if the transfer would have resulted in a significant change, Ms. Rosane agrees that the transfer did not occur.

### c. Causation

Causation is the crux of the disagreement between the parties on Ms. Rosane's retaliation charge. The School District argues that this court should find that the time period between the filing of the grievance (on September 18, 2009) and Ms. Rosane's termination (in April 2010) precludes a finding that her termination was causally related to filing her grievance. "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation. The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Tyler v. Univ. of Arkansas Bd. of Trustees,* 628 F.3d 980, 986 (8th Cir.2011); *Littleton v. Pilot Travel Ctrs., LLC,* 568 F.3d 641, 645 (8th Cir.2009) (temporal gap of seven months "not sufficiently contemporaneous" to indicate a causal connection); *Recio v. Creighton Univ.,* 521 F.3d 934, 941 (8th Cir.2008) (a six-month gap too long to give rise to inference of causation); *Lewis v. St. Cloud State Univ.,* 467 F.3d 1133, 1138 (8th Cir.2006) (interval as brief as two months did not show causation for purposes of establishing a retaliation claim).

The court notes that Ms. Rosane filed her grievance with the School District on September 18, 2009, and that was the first time she used the term "discrimination." The subject of her transfer to the other school was raised on September 24, 2009, just a few days later. In addition, the SDDHR issued its finding of no probable cause on February 11, 2010, which Ms. Rosane then appealed to the EEOC. The School District fired Ms. Rosane just a matter of weeks after that event.

In addition to temporal proximity between protected activity and adverse employment action, a plaintiff can use alternate circumstantial evidence to prove causation—generally more than timing is required. *Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756, 762 (8th Cir. 2004) (internal citations omitted). For example, as an alternative to inferring causation from timing, courts compare the employer's satisfaction with the employee's performance prior to and after engaging in protected activity. "A causal link between an employee's conduct and her termination may be shown if the retaliation occurred soon after the employee's protected conduct or if the employer's concerns about the employee's conduct arose only after the employee engaged in protected conduct." *Johnson v. Shinseki,* No. 4:08CV 1872, 2011 WL 3703277 (E.D.Mo. Aug. 23, 2011) (holding genuine issue of material fact precluded summary judgment where employer took no disciplinary action during employee's first ten years on the job, but after employee filed grievance, employer frequently reprimanded, failed to promote, and eventually terminated employee over one year after she filed complaint); *see also Pye,* 641 F.3d at 1021 ("there is no

evidence that [employer] had any concerns regarding [employee's] performance before he engaged in protected conduct").

In the recent case *Guimaraes v. Super-Valu, Inc.,* the Eighth Circuit affirmed the district court's grant of summary judgment on an employee's retaliation claim where the employer had concerns about the employee's performance before any grievance was filed. *Guimaraes,* 674 F.3d at 980. The court noted that "the employer had been concerned about a problem before the employee engaged in the protected activity." *Id.* at 978 (citing *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 1001 (8th Cir.2011)). Because the employer could demonstrate concerns with the employee's performance arising prior to the filing of her complaint, the employee could not prove that the employer's stated reason for terminating her—her performance—was pretextual. *Id.* In contrast to the plaintiff in *Guimaraes,* Ms. Rosane was meeting her employer's expectations. Docket No. 57 at 11. School District has not provided any evidence that Ms. Rosane was the subject of any disciplinary action prior to filing her grievance.

Ms. Rosane argues that the reason for her termination was pretextual. She argues that she was not terminated due to her employment at Gordon Hospital, but rather in retaliation for filing a grievance. She alleges that she contacted the School District on January 19, 2010, and March 25, 2010, to inquire about the status of the School District's investigation of her complaints and that she never received a response. *See* Docket No. 62 at 26; Docket No. 64–11. Ms. Rosane began work at Gordon Hospital on January 22, 2010. Docket No. 56–4 at 112:12–15. In the letter dated April 1, 2010, explaining the recommendation to the School Board that Ms. Rosane be terminated, School District stated "we are concerned about the implication that you received benefits for over three (3) months at a cost to the School District when you were, in fact, able and willing to work and did work at other facilities." Docket No. 56–29.

While this argument of pretext implicates the second and third steps of burden-shifting analysis, it does raise an issue of material fact. "A case may be taken from the jury only when there is no genuine issue of material fact.... Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment." *Minnis v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am.,* 531 F.2d 850, 854 (8th Cir.1975). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Guimaraes,* 674 F.3d at 972 (internal citations omitted). Here, a jury could arrive at two rationally possible conclusions regarding causation.

A reasonable jury could conclude that Ms. Rosane contacted the School District on January 19, 2010, as one last effort to understand the status of her employment and the pending investigation and when she received no response, she sought to mitigate her damages by accepting employment at Gordon Hospital. A reasonable jury could alternatively conclude that Ms. Rosane knew she was still employed by the School District and that she misrepresented her health situation in order to receive benefits from the School District while working for Gordon Hospital. This credibility determination is not one for the court to make. Because a genuine issue of material fact exists as to the School District's motives for terminating Ms. Rosane, the court recommends denying the School District's motion for summary judgment as the retaliation claim.

### 2. School District's Stated Non-retaliatory Reason

School District offers the non-retaliatory reason for termination "that [Ms. Rosane] had been employed elsewhere for several months, while remaining an employee of District on long-term leave, continuing to receive benefits." *See* Docket No. 66 at 16.

### 3. Whether Asserted Non-retaliatory Reason was Mere Pretext

In the summary judgment context, a plaintiff can establish a genuine issue of material fact exists if the employer's explanation has "no basis in fact" or if the plaintiff "can 'directly' persuade the court that a 'prohibited reason more likely motivated the employer.'" *Anderson v. Durham*, 606 F.3d 513, 521 (8th Cir.2010) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir.2006)). As discussed above, the same dispute as to the causation element necessarily implicates the pretext inquiry. Because a genuine dispute exists regarding the *prima facie* case, this court will not consider the final stage of the *McDonnell Douglas* analysis.

### E. Sovereign Immunity Under South Dakota Law

The School District asserts sovereign immunity as an affirmative defense. *See* Docket No. 57 at 27. The School District cannot assert immunity under Eleventh Amendment. The Eighth Circuit noted that the "plain language" of Title VII "demonstrates Congress' intent to abrogate Eleventh Amendment immunity of the states in this area." *Okruhlik v. Univ. of Arkansas ex rel. May*, 255 F.3d 615, 623 (8th Cir.2001). Because the School District has been denied insurance coverage on this matter, School District urges this court to apply South Dakota law to grant summary judgment on the basis of statutory sovereign immunity. *See* Docket No. 57 at 27.

South Dakota law provides: "Except insofar as a public entity participates in a risk sharing pool or insurance is purchased pursuant to § 21–32A–1, any public entity is immune from liability for damages whether the function in which it is involved is governmental or proprietary. The immunity recognized herein may be raised by way of affirmative defense." SDCL § 21–32A–3. The School District argues: "Insurance coverage does not exists; hence, there is no waiver of sovereign immunity." Docket No. 57 at 29.

Plaintiff resists this assertion of statutory sovereign immunity. "Municipal defenses—including an assertion of sovereign immunity—to a federal right of action are, of course, controlled by federal law." *Owen v. City of Independence, Missouri*, 445 U.S. 622, 647 n. 30, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Plaintiff draws a persuasive analogy between § 1983 and Title VII remedies: "Accordingly, we have held that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy." *Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).

When enacting and later amending Title VII, Congress "held extensive hearings and received numerous reports detailing racial and gender discrimination by the states." *Okruhlik*, 255 F.3d at 625. Allowing South Dakota state law to preempt Title VII provisions which subject state employers to employment discrimination lawsuits would thwart the underlying purpose of Title VII. Accordingly, this court recommends denying relief to School Dis-

trict under the affirmative defense of statutory sovereign immunity.

## CONCLUSION

Based on the facts and law discussed above, this court respectfully recommends that the School District's motion for summary judgment [Docket No. 56] be granted in part and denied in part as follows:

1. this court recommends granting defendant summary judgment on plaintiff's hostile work environment claim;

2. this court recommends denying defendant summary judgment on plaintiff's retaliation claim; and

3. this court recommends denying defendant summary judgment on its claim of sovereign immunity.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation and Order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. *See* Fed.R.Civ.P. 72(b). A party may respond to another party's objections within 14 days of being served with a copy. *Id.* Failure to file timely objections will result in the waiver of the right to appeal questions of fact. *Id.* Objections must be timely and specific. Timely, specific objections to the findings and conclusions will be reviewed *de novo* by the District Court. *Thompson v. Nix,* 897 F.2d 356 (8th Cir.1990); *Nash v. Black,* 781 F.2d 665 (8th Cir.1986).

Dated March 5, 2013.